**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00389-RBW** |
| **v.** | : | |
| | : | |
| **JOSEPH ELLIOTT ZLAB,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Joseph Elliott Zlab ("Zlab") to 45 days jail, 36 months probation, 60 hours of community service, and $500 restitution.

**I.     Introduction**

The defendant, Zlab, a self-employed general contractor, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Exactly one year after the U.S. Capitol riot, on January 6, 2022, Zlab pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, Count Five of the original Information. ECF Nos. 10, 37. As explained herein, a sentence of 45 days jail, 36 months probation, 60 hours of community service, and $500 restitution, is appropriate in this case because: (1) Zlab knew at the time he entered the U.S. Capitol building

1

that he did not have permission to enter the building, yet he went anyway, (2) Zlab was told by a law enforcement officer to leave, yet he continued to wander throughout the U.S. Capitol building, (3) Zlab remained in the Capitol building for approximately thirteen minutes, entering sensitive areas including the House Appropriations Room, (4) Zlab joined other groups of rioters while inside the building, and persisted despite observing tear gas – even making a video of it, (5) Zlab has indicated no remorse for his unlawful entrance into the Capitol and his text messages appear to indicate some pride as he entered the closed building, (6) according to Zlab, he left the U.S. Capitol building only because of law enforcement efforts to push rioters out, and (7) this is not Zlab's first crime, having bee convicted for Domestic Violence.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification.  This combined with the lengthy list of aggravating factors, identified above, support a sentence of 45 days jail, 36 months probation, 60 hours of community service and $500 restitution.  The United States believes this is necessary and appropriate in this specific case and for this defendant.

## II.    Factual and Procedural Background

*The January 6, 2021, Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 35 ¶¶ 1-7 (Statement of Offense).  As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*FBI Tip and Zlab's Interview*

On January 20, 2021, two weeks after the riot at the United States Capitol building, the FBI interviewed Zlab because they received a tip that he was inside the U.S. Capitol building. Zlab readily admitted that he traveled to Washington D.C. on January 6, 2021, stating that he went to attend President Trump's speech.  Zlab told agents that after the speech, he participated in a march to the U.S. Capitol building.  Zlab described the march as "happy Baby Boomers who were waving flags" and said there was no discussion of "storming the Capitol."  Zlab said when he got to the U.S. Capitol, people were already trying to get in.  Zlab stated that he circled the U.S. Capitol building taking pictures. When asked if he went into the U.S. Capitol building, Zlab said he thought he needed an attorney, "didn't think it was that big a deal" at the time and did not want to incriminate himself.

Following this interview, FBI reviewed U.S. Capitol security video and located Zlab entering and walking through the United States Capitol building during the riot on January 6, 2021. Zlab was observed to be wearing a bright red hat with blue and white lettering, a red coat, and he was carrying a yellow "Don't Tread on Me" Gadsen flag.  Zlab entered the U.S. Capitol building at approximately 2:38 pm through the Memorial Door, entering just after several officers left the door area and sliding past another officer:



Zlab moved quickly through the U.S Capitol building, covering multiple locations and floors in thirteen minutes.  He was even observed to jog at one point.  The security footage also showed that Zlab was taking photos or video with his cell phone while in the building.

After his entry at the Memorial Door, Zlab went to the Crypt where he was confronted by law enforcement officers, explained in more detail below.  From there he went up a stairway and into a foyer just outside the Capitol Rotunda:



This area was chaotic, full of jostling rioters who had just entered the U.S. Capitol building through the recently breached East Rotunda Doors.  Zlab them moved into and through the Rotunda, then walked through the National Statuary Hall:



From there, Zlab moved down the Hall of the House of Representatives, towards the entry to the House Chamber and shouted with others while moving towards the main door to House Chamber:



Zlab did not stay near this entrance long and walked instead down a hallway that flanked the House Chamber and ascended a stairway to the 3rd floor.  During these moments, further down the hall, Ashli Babbitt tried to enter the occupied House Chamber through a broken window on the Speaker's Lobby Door, and she was shot by law enforcement.[1]  Zlab turned before getting to the Speaker's Lobby and ascended a stairway and walked the third floor adjacent to the gallery of the House of Representatives:

---

[1]      The same path that Zlab took that day, was recorded by another several minutes earlier. *See* https://theresistance.video/watch?id=5ff6857e00bac0328da8e888 at 33:40–41:00.  The individual making the video worked his way through Statuary Hall, through the Hall of the House of Representatives to the threshold of the House Chamber Door. *Id.*  He then went down the same hallway that Zlab would later travel and to the Speaker's Lobby Door where he recorded the shooting.



While on the third floor, Zlab entered the House Appropriations Room for approximately 15-20 seconds:



After leaving the House Appropriations Room, Zlab descended a stairway, back down to the second floor, and made his way back to the main entry to the House Chamber. The air before Zlab was full of tear gas:



A careful review of this security video shows that Zlab moved down the corridor, as shown in the image above, and stopped and appeared to aim his camera in the direction of the House Chamber door. As explained below, Zlab took a video at this location.

Zlab then made his way back through Statuary Hall, wearing a mask – consistent with all the tear gas in the air:



Zlab reentered the Rotunda, then exited the U.S. Capitol building through the East Rotunda Door just after 2:51 pm:



*Zlab's Photos*

Agents observed Zlab appeared to be taking images or video with his cell phone throughout the U.S. Capitol security video.  Agents later found, pursuant to a search warrant, that Zlab had indeed taken multiple photos and videos while approaching the U.S. Capitol building

and while inside.  Indeed, a YouTube video shows Zlab taking one of these photos during his

approach to the U.S. Capitol building:



"Storming the Capitol," YouTube, uploaded by YPS News, January 16, 2021,

https://youtu.be/LeRYX4LOzYw?t=226 at 3:46.[2]  Indeed, one of the images that Zlab took with

his phone showed people scaling the west wall outside the U.S. Capitol building:



---

[2]      The same video also shows that multiple tear gas canisters were deployed as the crowd
entered the closed area on the west side of the U.S. Capitol building, in the area where Zlab
approached.  *Id.* at 1:00–4:00.

Zlab recorded several areas within the U.S. Capitol building.  Security video shows that Zlab went through the Crypt just after he entered the U.S. Capitol building.  At that location, Zlab recorded an angry officer shouting at Zlab and others to "get the fuck out of here!":



Submitted Exhibit A.  But Zlab continued, making his way to the Rotunda where he recorded 27 seconds that began with chants of "treason" by other rioters:



Submitted Exhibit B.  Zlab's images show that he worked himself down hallways, in and out of different crowds of rioters, to the area around the House Chamber, where he took an image just outside the House Appropriations Room, a 3rd floor location where few rioters ventured and where many staff offices are located:



Zlab's images show that he made his way back to the main entry to the House Chamber.  While there, he recorded a video showing the area filled with tear gas as an angry rioter shouted in the background: "You killed one of us?  You're done!", referring to the shooting that had just occurred in the House wing.







*Arrest and Searches*

Zlab was arrested pursuant to a complaint and arrest warrant on May 13, 2021. Following his arrest, the FBI executed search warrants for Zlab's cell phone and residence. Within Zlab's residence, agents located and seized some of the clothing and the flag that Zlab had with him on January 6, 2021. This included his red baseball cap with white and blue lettering, his red jacket, and his yellow Gadsen flag.

Agents also seized Zlab's cell phone and reviewed it for information related to his entry into the U.S. Capitol building on January 6, 2021. Text messages show that he traveled to Washington D.C. between January 5th and 7th, 2021, so that he could "make a request for an accurate vote count."[3] Text messages appear to confirm what is observed in security video – that Zlab traveled alone to D.C. and was not coordinating with others when he entered the Capitol.

On January 6, 2021, Zlab sent text several messages related to his entry into the U.S. Capitol building. His relevant text messages stated:

- "We got in the capital."
- "Little tear gas."
- "This is our house."
- "We got in."
- "They were pointing guns in OUR house."
- "I left inside a while ago when guns came out and gas."

## III.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months

---

[3]      Alaska Airline records, and Uber records, show that Zlab followed these travel plans and went to Washington D.C. between January 5 and 7, 2021.

of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 45 days jail, 36 months probation, 60 hours of community service and $500 restitution.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through barriers and barricades and heard the throes of a

mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants. The defendant's lack of violence and property destruction is the only reason he was charged only with, and permitted to plead to, a misdemeanor rather than felony.

In this case, Zlab acknowledges that he knew at the time he entered the U.S. Capitol Building that he did not have permission to enter the building, yet he persisted in entering, thereby assisting this dangerous day in U.S. history. *See* ECF 35 p 4 (Statement of Offense). As

Zlab approached the U.S. Capitol building, he observed and photographed people scaling walls, an obvious indication that the U.S. Capitol building was restricted.  More importantly, a video filmed at the location of Zlab's approach – and a video that even captures Zlab in the background – shows that several tear gas canisters were deployed into the crowd at the location where Zlab was approaching.  *See* "Storming the Capitol," YouTube, uploaded by YPS News, January 16, 2021, https://youtu.be/LeRYX4LOzYw?t=226 at 1:00-3:46 (ending at the moment that Zlab enteres the frame).  Although we do not know what Zlab heard that day, this videographer captured the crowd screaming obscenities towards police during the tear gas deployments and included screams of "treason," "fuck the blue," and "CCP," as rioters made their way towards the U.S. Capitol in the face of non-lethal deterrents.  *Id.*

Zlab's text messages indicate that he knew the U.S. Capitol was closed, because he texted: "We got in the Capital," "This is our house," and "We got in."  Importantly, shortly after Zlab entered, he went through the Crypt and encountered an officer who ordered Zlab and others to leave.  Zlab recorded this order, but he did not leave, but continued to work his way through the U.S. Capitol building with other rioters.  *See* Submitted Exhibit A.  After this, Zlab observed groups of riotous crowds, recording shouts of "treason," and encountering tear gas.  *See* Submitted Exhibits B and C.  Zlab knew that he was participating in a riot, yet he remained and only left - according to him - because of "gas" and "guns."

To date, Zlab has never expressed remorse for this incident.  He has never acknowledged the danger that January 6, 2021, posed to law enforcement or our democracy.  The aggravating factors associated with his conduct establish the need for a sentence of 45 days in custody, 36 months probation, 60 hours of community service, and $500 restitution.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, in 2015, Zlab was convicted for "Harassment-Domestic Violence" a gross misdemeanor in King County, Washington.  ECF 40 ¶ 25.  He was sentenced to 365 days custody, 2 days suspended, and also served 12 months' unsupervised probation.  *Id.* Because Zlab has a criminal record, and has already received a probationary sentence and jail time for a significant crime, something more than probation is warranted here.  Indeed, it is one of the reasons that we recommend incarceration.

While Zlab's eight years of military service is laudable, it renders his conduct on January 6 all the more egregious.  *See* ECF 40 ¶ 45.  As a former military member, Zlab was well aware of the need for temporary restrictions to protect sensitive governmental functions and facilities. His voluntary decision to storm this government building is nothing short of shocking in light of his former military service and training.  This is made even more stark because Zlab ignored law enforcement orders to leave the building.  One can hear the officer's heightened concern and attempt to control the riotous situation in the video that Zlab recorded.  Thus, Zlab's former military service makes his conduct on January 6 even more egregious and demonstrates a very real need for specific deterrence in the form of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a

---

[4]      Federal Bureau of Investigation Director Christopher Wray, Statement before the House

sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

Oversight     and     Reform     Committee     (June     15,     2021),     available     at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20
Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).   It is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Multiple factors support incarcerating Zlab for a period of time as a means of enforcing specific deterrence.   First, because Zlab was in the military, he knew, more than most, the importance of Government institutions and the threat that rioters posed to the Government when they entered a building at a moment when the Government was fulfilling a pivotal Constitutional requirement.   Second, Zlab ignored an early and specific law enforcement command to leave, yet he did not leave.   Third, after the law enforcement command, Zlab ventured throughout the U.S. Capitol building, even entering more sensitive and indirect places like the House Appropriations

Room and the area next to the House Chamber.  Fourth, Zlab photographed the tear gas and damage to the building.  Fifth, Zlab's contemporaneous text messages show that he knew his entry was wrong and indicated no regret for entering into the building.  Sixth, Zlab's lack of remorse stands stark in this case.  Zlab said he "didn't think it was that big of a deal."  Yet, Zlab saw tear gas, encountered law enforcement ordering him to leave, yet he was unrepentant about his conduct and even claimed it is "OUR house." He has never recognized that his participation was dangerous to the law enforcement officers (many were injured that day) and to this country.  Finally, while Zlab's criminal history is not lengthy, his domestic violence conviction is significant and shows a greater need for specific deterrents in this case.  Thus, the United States recommends 45 days incarceration, 36 months probation, and 60 hours of community service.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not necessarily become the default.[6] Indeed, the government invites

---

[5]     Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6]     Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna*

the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The defendant has pleaded guilty to the charge of Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor.  18 U.S.C. § 3559.  Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or

---

*Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*,

23

483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed in the following cases for reference:

In *United States v. Register*, 1:21-cr-00349-TJK, Register walked into the U.S. Capitol building, past broken windows and like Zlab, he ignored clear officer demands to leave. Like Zlab, Register went deeper into the building, and ultimately made his way to the entrance of the House Chamber. Like Zlab, Register did not stay at the main entrance to the House Chamber – instead he wandered the halls around the House of Representatives and made his way to the area near the Speaker's Lobby Door when Ashli Babbtit was killed, with Register in that area as a witness. Register, like Zlab, had two misdemeanor convictions - convictions for DUI and Reckless Driving, whereas Zlab has a prior Domestic Violence conviction. The Court sentenced Register to 45 days incarceration.

In *United States v. Wagner*, 1:21;cr-00310-ABJ, Wagner entered the U.S. Capitol building, and like Zlab, made his way to the Crypt. Like Zlab, Wagner received law enforcement orders to

not proceed further while in the Crypt.  Like Zlab, Wagner ignored these law enforcement commands.  Unlike Zlab, Wagner's statements within the U.S. Capitol building were recorded, and he advocated that people "hold" their ground because "people are gonna show up with weapons now."  Unlike Zlab, Wagner did not wander further through the U.S. Capitol building, nor did he have any prior criminal convictions.  The Court sentenced Wagner to 30 days incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### V.    The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of

this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence).

### A. A sentence imposed for a petty offense may include both incarceration and probation.

#### 1. Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[7] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[8]

---

[7]     A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part II *infra*.

[8]     Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

### 2. *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617

F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).   In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL

768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense.
*See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to
impose probation, the petty-offense clause limits this exception.").

   It follows that when a defendant *is* sentenced for a petty offense, that defendant may be
sentenced to a period of continuous incarceration and a term of probation.  *See United States v.
Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted
of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.*
at 808.   In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3)
"[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term
of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal
Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in
conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the
defendant is being sentenced for a petty offense, a trial court may properly sentence such individual
to a term of continuous imprisonment for a period of time, as well as a sentence of probation.")
(citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th
ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time
to imprisonment for an offense *that is not petty*.") (emphasis added).

   Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only
"different offense."  *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section
3561(a)(3) functions as an adjective that modifies "offense").  Section 3561(a)(3) does not state
"the same *offense* or a different offense that is not a petty offense," which would imply that the
final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."  The phrase
"that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated

phrase "the same or a different offense."  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012).  Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."  *Id.* at 148-49.  And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."  *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants.  *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense).  When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b).  *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific

statute will not be controlled or nullified by a general one.").  As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3).  That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, *supra*, at 184.  In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented."  *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail."  *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers."  *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section

3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Zlab pleaded guilty to 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir.

1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

**B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

*1. Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[9]

*A. Analysis*

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period"

---

[9]     Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[10]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes a imprisonment as a term of probation in Zlab's case given the requested 45-day imprisonment sentence.

---

[10]     Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

## VI.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence Joseph Zlab to 45 days jail, 36 months probation, 60 hours of community service and restitution of $500.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:     */s/ Michael W. Mitchell*
MICHAEL W. MITCHELL
Assistant United States Attorney
Detailed to the District of Columbia
Texas Bar No.  24037126
555 4th Street, N.W.
Washington, D.C. 20530

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the forgoing motion was served upon counsel of record through ECF on the date of filing, this the 28th day of March, 2022.

By: /s/ *Michael W. Mitchell*
   MICHAEL W. MITCHELL
   Assistant United States Attorney
   Detailed to the District of Columbia
   Texas Bar No.  24037126
   555 4th Street, N.W.
   Washington, D.C. 20530
