UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Criminal No.  21-cr-00389-RBW |
| v. | |
| JOSEPH ELLIOTT ZLAB, | |
| Defendant. | |

**DEFENDANT'S SENTENCING MEMORANDUM**

**I.    INTRODUCTION**

Joseph Zlab is a hard-working family man who traveled alone to Washington, D.C. from his home near Seattle, Washington to attend a political rally. On January 6, 2021, after the conclusion of the rally, he unlawfully entered the United States Capitol Building, a decision that he will regret for the rest of his life.

While he was in the Capitol:

- Mr. Zlab did not commit any violent acts;

- Mr. Zlab did not threaten any person;

- Mr. Zlab did not engage or provoke any law enforcement personnel;

- Mr. Zlab did not damage any property;

- Mr. Zlab did not join any particular group of other persons.

Mr. Zlab was in the Capitol Building for approximately 13 minutes after entering a door held open by a U.S. Capitol Police Officer. During Mr. Zlab's time in the Capitol, he walked around alone and took a few pictures and videos. After leaving the Capitol and

1

realizing the extent of the lawlessness and violence that occurred, Mr. Zlab did not gloat, boast, or publicize his involvement, as so many January 6 defendants did in the days after the event. Rather, on January 6, 2021 at 5:11 p.m. he sent an email to his brother and a close friend immediately repudiating his conduct:



Appendix B. Undersigned counsel is not aware of any other January 6 defendant who so quickly renounced his or her involvement.

In his letter to this Court acknowledging his wrongdoing and failure to listen to his conscience, Mr. Zlab admits:

> …I was part of a mob of people that entered into the Capitol Building. I did not get permission to enter this restricted building and knew better than to just walk in. I am a grown man, a husband, a father, and a business owner.
>
> *  *  *
>
> I went to Washington D.C. to take part in a protest and a march, which coincided with my birthday (January 7). Similar to my trip in December 2020 with my wife and her sisters, my intent was to exercise my freedoms of speech and assembly in a lawful and peaceful manner. While the day started out that way, I did not listen to my better instincts, and I unwisely entered the Capitol Building. This protest turned into a riot and an unruly mob, and has now left a stain on American history. I am so sorry that I had any part of these events and at this point can only ask for leniency from the court for my actions.

Appendix A (Letter of Joseph Zlab).

Mr. Zlab's respectfully requests that the Court impose a sentence of 12 months of probation; 40 hours of community service; and $500 in restitution. This sentence is appropriate to avoid unwarranted sentencing disparities in light of similar probationary

sentences imposed in other January 6 cases, many of which involve aggravating circumstances as compared to Mr. Zlab. In addition, the requested sentence is proportionate with recent sentences imposed by this individual Court. *See, e.g., United States v. Anthony Mariotta*, 21-cr-94-RBW (36-month probation sentence where defendant was present on front lines directly opposite police officers in full riot gear, remained in Capitol for 20 minutes, and stood by and video-recorded "a massive assault on police officers").

## II.   THE HISTORY AND CHARACTERISTICS OF JOSEPH ZLAB

### A.   Biographical Summary

Mr. Zlab is 52 years old. He lives in Lake Forest Park, Washington, a suburb north of Seattle, with his wife Shawna and their five children, ages 20, 17, 15, 14, and 12.

Mr. Zlab was born in Altadena, California. Soon thereafter, his family moved to Pasadena, where he lived through his high school years. Growing up, Mr. Zlab lived with his parents and two siblings. Mr. Zlab had an active adolescence, participated in sports, a church youth group, and other school activities. Mr. Zlab's youth was generally positive, although he was abused by a trusted family friend. The incident led to a deterioration in Mr. Zlab's relationship with his father, though the two reconciled shortly before Mr. Zlab's father's death. PSR ¶ 32-33.

After high school, Mr. Zlab attended college at the University of Illinois, Urbana-Champaign, where he received a Bachelor's of Science in Civil Engineering, followed by a Master's of Science in Civil Engineering. *See* PSR ¶ 36. After graduating in 1993, Mr. Zlab spent the summer in Tokyo, Japan completing an internship. *Id.* Thereafter, he began working as a consulting engineer in Los Angeles and Seattle. In 1998 Mr. Zlab and Shawna were

married. They ultimately settled in the greater Seattle, Washington area. In 2003, Mr. Zlab obtained his Certificate in Commercial Real Estate from the University of Washington. Since 2015, Mr. Zlab's employment has centered around his own real estate development business, JMZ Contractors, LLC. PSR ¶ 47.

In 2015, Mr. Zlab was charged in Washington state court with the crime of Harassment – Domestic Violence related to an incident with his wife. Mr. Zlab ultimately pleaded guilty to a gross misdemeanor offense. He received a fully suspended sentence, was ordered to complete 45 hours of community service and attend review hearings where he was to provide updates on alcohol treatment and counseling sessions.[1] Mr. Zlab attended each of the scheduled review hearings, and the court entered orders finding Mr. Zlab in compliance with his sentence, including his community service hour obligation and attendance at AA meetings.

It was clear that the 2015 incident was the result of Mr. Zlab's untreated alcohol disorder. Shawna Zlab explains the circumstances of the prior case in her letter to this Court:

> Life is certainly not perfect and neither are we. Most of our marriage, Joe drank alcohol as a way to cope with work stress and frustration. He had a "crazy boss" who he worked closely with in the challenging field of real estate development. I watched as it became troublesome for him and our family. Seven years ago, I called 911 after he was drunk and loud, expecting the police to deescalate. He managed to say the wrong thing and do the wrong thing and the issue was instead escalated. This situation was awful for both of us, but in

---

[1] Paragraph 25 of the presentence report incorrectly stated that Mr. Zlab received a sentence of 364 days in jail with 2 days suspended. The defense had timely objected to the draft presentence report, and explained that the sentence was actually 364 days suspended, and that the only actual jail sentence Mr. Zlab was ordered to serve were the two days for which he had credit based on his original booking. This error – which was repeated in the government's original sentencing memorandum – created the erroneous impression that Mr. Zlab had been sentenced to actually serve a full year in jail, when in reality the year of jail time was suspended. On March 28, 2022, undersigned counsel again renewed this objection and provided the judgment to probation and the government. The government has now filed an Amended Sentencing Memorandum correcting this error. *See* Dkt. 44 at n.4.

the end, Joe completely quit drinking and continues to attend a 12-step sobriety program. While this past offense could be used against him with this trespassing offense, I would like to argue that it shows the painful but potentially restorative aspect of the justice system. I have zero desire to relive that time in our life, but it did serve as a "wake-up" call and Joe responded humbly and with positive action.

Shawna Zlab Letter at 2.[2]

Mr. Zlab's sister, Ms. Childers adds:

Joe regretfully chose to deal with excessive job stress through alcohol, which led to a painful domestic situation. Confronted with a crisis, as he is confronted by one now, Joe immediately addressed the problem, quitting his job, tackling the substance abuse, healing any breach with his family." Jo Ann Peterson, Mr. Zlab's mother-in-law, similarly writes that "Joe has struggled with an alcohol addiction, but when it created intolerable problems, he sought help through AA to overcome the difficulty…This firm commitment to not giving in to a tempting addiction is further proof of his strong desire to do things right and be the best husband and dad he can be.

Elizabeth Childers Letter at 2.

**B.  Mr. Zlab is Universally Recognized as a Hardworking Person Committed to the Well Being of His Family and Others**

Those who know Mr. Zlab write about his work ethic and commitment to others. Ms.

Childers writes:

After college, I returned to California to see him excel in high school while working at the same time in landscape maintenance on weekends and after school.  In addition, he mowed lawns outside his regular job, even working for the elderly lady across the street for free.  I also admired the energy with which he pursued various scholarships towards an engineering degree from the University of Illinois.  He was able to win a few, and made up the financial difference by delivering pizzas, often in subzero temperatures.

Elizabeth Childers Letter at 2.

---

[2] Support letters from Mr. Zlab's family and friends are included as Appendix C.

Leah Davis, Mr. Zlab's sister-in-law, describes Mr. Zlab's call to the Navy Reserves following the September 11, 2001 attacks: "Not long after the twin towers fell on 9/11 Joe joined the Reserves and was gone many weekends training even though he also worked long hours as an engineer and managed several low-income housing units that needed lots of attention." Shawna Zlab notes that, although the reserve commitment was time-consuming for Mr. Zlab, who was a young parent at the time, "[t]he weekend and annual reserve duty was something we were both proud he could do."

Ms. Peterson writes that, "[w]hatever Joe does, he does wholeheartedly. Not only do I admire his intelligent mind, but even more so, his very strong work ethic.  I don't know anyone who works harder and probably few who accomplish more." Mr. Zlab's oldest son, Joseph Henry Zlab, writes that his father is "certainly the most hardworking person I know. Some people work 6-day weeks, but he has worked 7-day weeks…All the way from working his way through engineering school by delivering pizzas for Dominos, he is finally realizing his dream of developing an apartment complex through a company he helped raise from the ground up." Shawna Zlab recalls Mr. Zlab "cleaning out stuck sewers late at night." Rachel Barnes, Mr. Zlab's sister-in-law, adds that "[y]ou can always depend on him to help when there is a need…He is one of the hardest working people that I know."

Eric Cunningham, one of Mr. Zlab's business partners, writes that in their dealings together, Mr. Zlab has "always shown nothing but impeccable character and ethics as we've run our company together…Joe is truly a good man and I'm proud to call him my friend."

George Hoffman, III, a close friend of Mr. Zlab's for decades, writes that Mr. Zlab is "exceedingly hardworking and generous" in running his business and thinking of his

employees. Mr. Hoffman notes that while Mr. Zlab is an engineer by trade, "he always enjoyed doing the actual work and has been caring and helpful in teaching his children how to plan, design, build and construct certain projects, photographs of which he has shared with me through the years."

Patrick Peterson, Mr. Zlab's father-in-law, "attest[s] to the fine character of Joe as a committed, hardworking, and dedicated husband, father, and citizen of this country." Park Peterson, Mr. Zlab's uncle, writes that Mr. Zlab is "innovative, sensible, religious, trustworthy, and hardworking." Jason Colberg, Mr. Zlab's neighbor, remarks on Mr. Zlab's "focus and interest in continual self/family/community improvement…a somewhat rare trait that I at least admire…Joe Zlab is an exceptional friend, neighbor, father and professional."

In sum total – the instant offense conduct aside – Shawna Zlab notes that her husband's "life has shown him to be a hard-working provider, protector, and patriot to his country and family."

## III.    THE OFFENSE CONDUCT

In mid-December 2020, Mr. Zlab traveled to Washington, D.C. with his wife and her two sisters. The group attended speeches, participated in a march on December 12, and peacefully exercised their lawful right to assemble. They stayed at the Capitol Hilton Hotel and visited many traditional Washington, D.C. tourist destinations, including the Washington Monument and Lincoln Memorial, Ford's Theater, the Vietnam and Korean War Memorials, and Christmas decorations near the White House.

Rachel Barnes, Mr. Zlab's sister-in-law, writes about the trip: "It was a peaceful, prayerful time with other citizens…We walked for miles all over D.C., met wonderful people,

listened to speakers and enjoyed the unity and love for this country expressed that weekend in D.C.  When I heard that Joe was returning on January 6th, I was so proud that he dedicated the time to fly solo across the country again to hear speeches and take part in this patriotic and peaceful event." Ms. Davis similarly understood that Mr. Zlab's return trip was a continuation of his peaceful assembly intentions: "Based on the trip I had taken with Joe and my sisters on Dec. 12th, I believe that Joe's motivation was to have our nation heal and to pray…"

In late December 2020, Mr. Zlab decided that he would return to Washington, D.C. to attend another rally organized by then-President Donald Trump scheduled to be held on January 6, 2021. The trip coincided with Mr. Zlab's birthday on January 7. Mr. Zlab invited his oldest son Henry to travel with him, but Joseph decided not to go, largely due to school obligations:

> My father actually invited me to join him on January 6th, to attend what we both believed would be an exciting but uneventful political rally. I chose to decline primarily due to school, but I also understood that the situation would be contentious, and I don't like big crowds anyway…I hope this portrays exactly what kind of mindset my father had going into this event. Far from having any premonition that things would devolve into violence, he was inviting his own children to join him in peacefully supporting a political cause he believed in.

Joseph Henry Zlab Letter at 2.

Mr. Zlab did not communicate or coordinate with anyone else who was going to the January 6 event. He arrived in Washington, D.C. on January 5, 2021. He attended speeches in the evening and checked into his hotel, again staying at the Capitol Hilton. Mr. Zlab ate dinner alone at "Five Guys," a burger chain, and went to bed. The next morning, on January 6, Mr. Zlab grabbed coffee and breakfast alone and went to the rally led by then-President Trump. He spent several hours waiting to get through security and for the speeches to start.

After the speeches concluded, Mr. Zlab began walking toward the Capitol Building, following others who had gathered for the speeches.

This was a long, slow march as tens of thousands of people marched from the rally location to the Capitol.[3] At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades and officers of the U.S. Capitol Police who were stationed around the Capitol, and members of the crowd advanced to the exterior façade of the building. Dkt. 35 at 2. Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement. Dkt. 35 at 2.

Mr. Zlab did not take part in any violence or destruction that resulted in the initial protesters gaining access to the Capitol. Rather, he was following a large crowd of persons walking from the rally site.

Nearly 40 minutes after the initial security breaches, at approximately 2:38 p.m., Mr. Zlab entered the U.S. Capitol through the Memorial Doors, which were held open by a U.S. Capitol Police Officer:

---

[3] *See* Newsweek, "Exclusive: Classified Documents Reveal the Number of January 6 Protestors," December 23, 2021, https://www.newsweek.com/exclusive-classified-documents-reveal-number-january-6-protestors-1661296 (noting 25,000 participants were screened by Secret Service to enter the official viewing area where President Trump was speaking, and as many as 120,000 total protesters were present in D.C. according to documents reviewed by Newsweek, but not officially released).



Appendix D (screenshots from videos taken by Mr. Zlab on January 6, 2021).[4]

    While in the Capitol, Mr. Zlab walked through the Crypt, the Rotunda, the National

Statutory Hall, the hallway outside of the Hall of the House of Representatives, the House

Gallery, and the House Appropriations Room. Dkt. 35 at 9. Thereafter, he began following a

crowd out of the Capitol:

---

[4] Counsel submits these photos not to excuse Mr. Zlab's conduct or suggest that he had permission to enter.
Mr. Zlab most definitely <u>did not</u> have permission to enter, and admits that he knew he was entering
unlawfully. Indeed, counsel agrees that videos showing Mr. Zlab's entry appear to demonstrate that the
officer was holding the door open so individuals could *leave* the Capitol, not so they could enter. However,
in other January 6 cases, the government has often focused on the specific facts surrounding each individual
defendant's entry into the Capitol as bearing on that defendant's relative culpability as it pertains to the
imposition of an appropriate sentence. Did the defendant come face to face with police officers in riot gear
standing behind a barrier? Did the defendant enter a broken window? Did the defendant break a window or
force open a door? Did the defendant push through police forces? Did the defendant gain access to the Capitol
after being denied entry at a prior location? Accordingly, the circumstances of Mr. Zlab's entry remain
relevant to the consideration of an appropriate relative sentence.



Appendix D. Mr. Zlab exited the Capitol at 2:51 p.m. having been inside for 13 minutes.

Mr. Zlab walked back toward his hotel alone. He picked up takeout pizza nearby, returned to his hotel, and began watching the news on television. The gravity of what had taken place – and what he had participated in – began to sink in:

> I returned to my hotel room and saw to my horror what was on the news.  I became agitated, lost all appetite, and couldn't finish my dinner.  I had not personally observed violence while I was approaching the building nor while inside.  When I realized the extent of what had happened, and appreciated my involvement, I was physically sick to my stomach.

Appendix A.

Mr. Zlab did not post pictures, videos, or other statements on social media, as many hundreds of other defendants did.

Mr. Zlab did not give media interviews, as numerous other defendants did.

Mr. Zlab did not delete any evidence, as other defendants did.

Mr. Zlab did not boast or brag about the experience, as numerous defendants did,

Mr. Zlab did not publicly proclaim that he would "do it again" or "be at the next one," a sentiment expressed by numerous defendants.

Instead, as discussed above, Mr. Zlab wrote an email to his brother and a friend noting that the violence he was seeing on television was making him sick: "Not good at all…If things don't change I'm probably going to step away from it all. I'm not going to be a part of it if there is chaos and no integrity."

Mr. Zlab returned to Washington state to his home with his wife and five children and his job as a real estate developer. On January 20, 2021, the FBI contacted Mr. Zlab by phone. Mr. Zlab admitted attending former President Trump's speech and circling the Capitol to take pictures. When asked whether he went inside, Mr. Zlab stated that he wanted an attorney because he did not want to say anything incriminating. Dkt. 3-4. Notably, he did not lie to the police.

Mr. Zlab was arrested and released without incident on May 13, 2021. He has attended all required court hearings and dutifully abided by his conditions of release. Mr. Zlab did not press this matter toward trial. On January 6, 2022, he timely pleaded guilty to Count Five of the Information, Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(G). Dkt. 34.

IV.    **A SENTENCE OF PROBATION IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO ADDRESS THE RELEVANT SENTENCING OBJECTIVES**

Of course, this Court is well aware that a sentencing court's "overarching duty" is to "impose a sentence sufficient, but not greater than necessary, to comply with the sentencing purposes set forth in § 3553(a)(2)." *Pepper v. United States*, 562 U.S. 476, 491 (2011) (internal quotations omitted).[5]

### A. A Sentence of Probation Reflects the Seriousness of this Offense, Provides Just Punishment, and Affords Adequate Deterrence

Mr. Zlab recognizes the seriousness of this offense and acknowledges his role in the events on January 6, 2021 at the United States Capitol. Supervision by the United States Probation Office includes conditions that will restrict Mr. Zlab's activities and monitor his conduct, which will have a significant punitive and deterrent effect. A probation sentence reflects the seriousness of Mr. Zlab's offense conduct and sends a message that Mr. Zlab's conduct will not go unpunished, and that official intervention by the United States Court system – with restrictions impacting Mr. Zlab's life – is justified.

---

[5]    Section 3553(a)(2) states that such purposes are to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant"; the kinds of sentences available; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

### B. A Sentence of Probation is Necessary to Avoid Unwarranted Sentencing Disparities Between Similar Cases

A sentence of probation is also justified in light of the sentences imposed on similarly situated defendants who have already been sentenced for their role in the events of January 6 at the U.S. Capitol. Nearly 120 defendants have already been sentenced for their roles in this offense. Based on counsel's review of a sentencing table filed by the government in a recent case, it appears that just under half of the defendants sentenced to date have received a sentence of incarceration. *See United States v. Jenny Cudd*, 21-cr-68-TNM, Dkt. 90-1.

Respectfully, Mr. Zlab's conduct, when compared to the spectrum of conduct of other January 6 defendants, does not fall into the category of defendants who should be imprisoned for their role in this offense.

To demonstrate why a sentence of probation is appropriate relative to other sentences, it is helpful to consider several categories of January 6 defendants who have been sentenced:

### 1. A Sentence of Probation is Justified Given the Prior Sentences Imposed by this Court on January 6 Defendants

By undersigned counsel's review, to date this individual Court has sentenced six defendants in January 6 Capitol cases. A review of the facts of these other cases and the sentences imposed demonstrates that a sentence of probation is justified for Mr. Zlab. Beginning with the longest incarceration sentences, in descending order, the cases are as follows:

a.  *United States v. Jeffrey Smith*, 21-cr-290-RBW

- **Was on the front line of rioters**

- **Warned officers to "stand down" and "[w]e're getting in there one way or another"**

14

- **Led charge to open the Rotunda doors from the inside to let in a violent mob**

- **Sentence: 90 days of incarceration**

On March 15, 2022, this Court sentenced Jeffrey Smith to 90 days of incarceration and two years of probation. As noted by the government, Mr. Smith played a significant personal role in the breach of U.S. Capitol Security:

> He led the removal of barricades from the inside of the Rotunda doors on the east side of the Capitol and attempted to open those doors to let in a mob of violent and destructive rioters. Although three police officers initially prevented him from opening the doors, Smith returned to the Rotunda doors to assist a growing mass of rioters in overwhelming the officers by sandwiching them against the doors which caused the doors to open from the inside and triggering the first and only major breach point on the east side of the Capitol (confirmed by the Capitol Police). This allowed the large mob to enter the Capitol that police had managed to repel a few minutes before, now compromising the Capitol on both the east and west sides. Smith then led those rioters upstairs. _**Far from being a follower simply caught up in the crowd, Smith—a former Army sergeant—quite literally led the charge to open the Rotunda doors from the inside to let in a violent mob clearly visible to him through the damaged door windows on the outside.**_

Dkt. 36 at 1-2 (emphasis supplied). Numerous pictures from security footage show the chilling progression of Mr. Smith's active work to remove benches and open doors to allow the rioting mob to flow into the Capitol:



Dkt. 36 at 10-14. Mr. Smith's conduct is aggravated and not similar to Mr. Zlab's conduct.

       b.  *United States v. Adam Johnson*, 21-cr-648-RBW

- **Class A misdemeanor offense**

- **Temporarily stole Speaker Pelosi's podium and carried it to the Rotunda for a "photo op"**

- **Formed part of a mob that overwhelmed and crushed a line of police**

- **Deleted evidence**

- **Sentence: 75 days in jail; 12 months supervised release**

On February 25, 2022, this Court sentenced Adam Johnson to 75 days in jail followed by 12 months of supervised release. Mr. Johnson pleaded guilty to Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. 1752(a)(1), a class A misdemeanor. Dkt. 38 at 1. As explained by the government, Mr. Johnson's conduct involved numerous aggravating circumstances:

In particular, Johnson: (1) ran towards the Capitol after hearing it had been breached; (2) recorded a video of rioters assaulting and disarming police officers outside the Capitol; (3) witnessed officers use tear gas and flash bang devices to disperse the crowd and yet persisted in breaching the Capitol through the Senate Wing Door, alongside rioters who were entering through a smashed window; (4) ascended a staircase to the second floor and traveled all the way to the doors to the House Chamber; (5) tried to open a door he believed was to Speaker Pelosi's office, shortly after her staffers had barricaded themselves against the mob just across the hall; (6) temporarily stole and carried the Speaker's podium to the Rotunda for a "photo op"; formed part of a mob that overwhelmed a line of police guarding the entry way to the House Chamber and crushed officers during its advance; (8) witnessed rioters attempt to break down the doors to the House Chamber and encouraged them to do so by shouting that a bust of George Washington would make "great battering ram"; and (9) destroyed evidence by deleting videos and photographs from his cell phone as well as his entire Facebook account.

Dkt. 49 at 1-2. In the days following January 6, Mr. Johnson bragged that he was "'finally famous,' presumably in reference to the photo of himself carrying the podium that went viral." Dkt. 49 at 11. Mr. Johnson's image became a widely disseminated symbol of the mayhem and disruption of the congressional proceedings:



Dkt. 49 at 8. Later, in the middle of plea negotiations, "the government received a tip that Johnson intended to capitalize on his criminal activities in the Capitol by publishing a memoir of some sort." Dkt. 49 at 12.

Mr. Johnson's conduct is aggravated and not similar to Mr. Zlab's conduct.

      c.   *United States v. William Tryon*, 21-cr-420-RBW

- **Class A Misdemeanor offense**

- **Expressly told by police that he could not enter Capitol**

- **Observed rioter break a window, remove the glass, and then open and leave open a door**

- **"It was awesome."**

- **"This was nothing so far."**

- **Compared January 6 to Normandy invasion during World War II**

- **Sentence: 50 days of incarceration; 12 months supervised release**

On January 14, 2022, this Court sentenced William Tryon to 50 days of incarceration and 12 months of supervised release.

Mr. Tryon pleaded guilty to the Class A misdemeanor of Entering and Remaining in a Restricted Building or Grounds. Dkt. 23 at 1. Mr. Tryon was on the front lines of the breach, and was initially denied entry by law enforcement. Dkt. 23 at 4. Indeed, as noted by the government, "Tryon is one of a much smaller group of rioters because he was expressly told by law enforcement officers that he could not enter the Capitol Building." Dkt. 23 at 12. Mr. Tryon personally observed a fellow rioter break a window, remove the glass, and then open and leave open a door. Dkt. 23 at 12-13. Mr. Tryon remained inside the Capitol even after hearing a gunshot. Dkt. 23 at 5. During a post-arrest interview, Mr. Tryon maintained that "the whole thing was powerful" and "[i]t was awesome." Dkt. 22 at 5. Talking to a citizen

journalist on the steps of the Capitol, Mr. Tryon compared his actions to the storming of Normandy during World War II, later adding, "This was nothing so far." Dkt. 23 at 6.

Mr. Tryon's conduct is aggravated and not similar to Mr. Zlab's conduct.

### d.   *United States v. Mariposa Castro*, 21-cr-299-RBW

- **Traveled from hotel to Capitol only *after* she saw the destruction and mayhem**

- **Live-streamed for 45 minutes, including entering through a broken window**

- **"This is war"**

- **"I'm going back out to DC Capital. This is not over!!!"**

- **Sentence: 45 days incarceration**

On February 23, 2022, this Court sentenced Mariposa Castro to 45 days in jail.

Notably, Ms. Castro did not follow other protesters to the Capitol from the "Stop the Steal" rally. Rather, she traveled to the Capitol Building directly from the Embassy Suites hotel, arriving at the Capitol around 3:48 p.m. Dkt. 40 at 9. Her decision to travel to the Capitol appears to have been made only *after* witnessing the media accounts showing the violence and destruction at the Capitol.

Ms. Castro entered the Capitol building through a broken window. Dkt. 35 at 3. As related by the government in its sentencing memorandum: "In videos eventually viewed nearly 5,000 times, Castro broadcast live to hundreds of Facebook viewers her presence on restricted Capitol grounds for at least 47 minutes, repeatedly announcing her intent to 'break in' and then documenting her unlawful entry into a conference room of the U.S. Capitol Building through a smashed-out window. Ms. Castro "exulted at the rioters' success," telling

her followers, "[w]ar just started" and "[i]t was so ugly. It got ugly in there. It got really ugly." Dkt. 40 at 2. She called upon her social media followers to join her in a "civil war." *Id.* at 3. Prior to entering the Capitol, Ms. Castro exclaimed on a recording: "we're breaking in! We are breaking in!...No more bullshit! That's it." *Id.* at 3. After being driven away from the Capitol Building by law enforcement, Ms. Castro live-streamed a conversation with a passerby, in which she declared: "It's a civil war." Dkt. 40 at 16. When the passerby stated: "Traitors will be shot. Pence, we're coming," Ms. Castro affirmed, "We're coming…This is war…This is war." Later, Ms. Castro posted "I'm going back out to DC Capital. This is not over!!!"

Ms. Castro's conduct is aggravated and not similar to Mr. Zlab's conduct.

e. *United States v. Thomas Vinson and United States v. Lori Vinson*, 21-cr-355-RBW

- **Entered Capitol minutes after rioters broke glass and breached Capitol**

- **Remained in Capitol for 30 minutes**

- **"…I would do this all over again tomorrow"**

- **"I felt like I've done nothing wrong and I wouldn't' change it"**

- **Sentence: 5 years of probation; 120 hours of community service**

On October 22, 2021, this Court sentenced Thomas Vinson and Lori Vinson each to 5 years of probation and 120 hours of community service. *See United States v. Thomas Vinson*, *United States v. Lori Vinson*, 21-cr-355-RBW.

On December 24, 2021, Mr. Vinson posted on Facebook: "Room is booked for DC…I'm a Veteran who[se] Oath will NEVER expire, Stand Strong, and Stand Now! If you don't you May never have the chance again! Merry Christmas and plan Well! It Will be Wild!

My President Proclaimed It So!" On January 6, 2021, Mr. Vinson and his wife entered the U.S. Capitol just minutes after rioters breached the glass at 2:13 p.m. Dkt. 44 at 3-4. Multiple images submitted by the government showed Mr. Vinson and his wife at the front lines of groups of rioters who were confronting law enforcement. *See* Dkt. 44 at 6-7. In total, Mr. Vinson and his wife appear to have been in the Capitol Building for approximately 30 minutes before leaving around 2:50 p.m. Dkt. 44 at 8.

In direct messages after January 6, 2021, Lori Vinson told multiple people she would "do it again." Dkt. 43 at 9. She reiterated these beliefs in subsequent media interviews, stating, "…I would do this all over again tomorrow" and "I hope that is something I remember and say, 'I'm glad was a part of that' thirty years from now." She added, "People have asked are you sorry that you done that, absolutely I am not, I am not sorry for that, I would do it again tomorrow," and "I felt like I've done nothing wrong and I wouldn't' change it." Dkt. 43 at 11. Ms. Vinson acknowledged being one of the first hundred people inside the Capitol. Dkt. 42-43.

The Vinsons' conduct is far more aggravated than Mr. Zlab's conduct. They entered the Capitol just minutes after the breach, which means that they likely personally observed the violence and destruction on the front lines. Their media statements demonstrate their failure to accept responsibility and their belief that their actions were justified. Mr. Zlab should receive a far lesser sentence than the Vinsons, who were sentenced to 5 years of probation and 120 hours of community service.

   f. *United States v. Anthony Mariotto*, 21-cr-94-RBW

- **Present on front lines directly opposite police officers in full riot gear**

- **Stood by and video-recorded "a massive assault on police officers"**

- **Sentence: 36 months of probation; 250 hours of community service**

On December 17, 2021, this Court sentenced Anthony Mariotto to 36 months of probation and 250 hours of community service. Upon arriving at the Capitol on January 6, 2021, Mr. Mariotto made his way to the front lines and look a video of himself positioned directly in front of officers behind a fence dressed in riot gear and armed with tear gas:



Dkt. 35 at 4.

Mr. Mariotto stood by and video recorded multiple mob assaults on law enforcement, described by the government as "a massive assault on police officers":





Dkt. 35 at 8-9.

Mr. Mariotto spent approximately 20 minutes inside of the Capitol. Notably, he entered the Senate Gallery and took a selfie photograph of himself smiling broadly with the gallery behind him:



Dkt. 35 at 10.

The day after he was arrested, Mr. Mariotto gave an interview with a local news station in which he claimed that "his 'entry was not violent,' referring to that allegation as 'fake news.'" Dkt. 35 at 11. Mr. Mariotto deleted his Facebook account prior to the FBI learning about his conduct on January 6. Dkt. 35 at 10.

Despite this aggravated conduct, this Court declined to impose a sentence of imprisonment as requested by the government.

Mr. Mariotto – who received the most lenient sentence yet imposed by this Court – engaged in conduct that was substantially more aggravated that Mr. Zlab's conduct. Mr.

Mariotto was on the front lines of the breach. He was in the Capitol for longer than Mr. Zlab. Mr. Mariotto witnessed and documented multiple mob assaults on the police, and he gleefully posted a selfie of himself in the deserted Senate Gallery. Mr. Zlab should receive a sentence far less than Mr. Mariotto's sentence of 36 months of probation and 250 hours of community service.

### 2. Three Defendants Have Received Two Month Probation Sentences with Aggravating Circumstances as Compared to Mr. Zlab

a. *United States v. Jenny Cudd*, 21-cr-68-TNM

- **Ms. Cudd declared this "a revolution"**

- **"[F]uck yes, I am proud of my actions, I fucking charged the Capitol today"**

- **Sentence: Two months of Probation; $5,000 fine.**

On March 23, 2022, Jenny Cudd was sentenced to two months of probation.

Ms. Cudd entered the Capitol at approximately 2:35 p.m. and departed at approximately 2:54 p.m. Ms. Cudd prepared in advance for violence by wearing a bulletproof sweatshirt. Dkt. 90 at 1. After leaving the Capitol, Ms. Cudd live-streamed a video of herself on social media. During the interview, Ms. Cudd admitted entering the Capitol, stating: "I was here today on January 6th when the new revolution started at the Capitol." Dkt. 76 at 5. Ms. Cudd admitted that she had physically helped breach the security at the Capitol: "we just pushed, pushed, and pushed, and yelled go and yelled charge. We just pushed and pushed, and we got it." Dkt. 76 at 5. She took responsibility for further breach and destruction inside the Capitol: "We did break down the Nancy Pelosi's office door and somebody stole her gavel and took a picture sitting in the chair flipping off the camera." *Id.* at 5. Ms. Cudd admitted

that she was proud of her actions: "…fuck yes, I am proud of my actions, I fucking charged the Capitol today with patriots today. Hell, yes I am proud of my actions." *Id.* On January 8, 2021, Ms. Cudd participated in an interview with a news station in which she stated: "I would do it again in a heartbeat because I did not break any laws…yes, I would absolutely do it again." *Id.*

Ms. Cudd pleaded guilty to a more serious crime – a Class A misdemeanor – than Mr. Zlab. She entered the Capitol around the same time as Mr. Zlab, but stayed inside longer (approximately 19 minutes). Her statements to the media and on social media are indefensible. Her pre-January 6 statements publicizing "a revolution" are precisely why this tragic event occurred. If individuals such as Ms. Cudd had never made such postings, the masses would never have converged on the Capitol in the way they did, and the destruction and violence would not have occurred. Moreover, Ms. Cudd remained proud and defiant in the days following January 6, demonstrating her lack of remorse and intent to engage in similar conduct.

Ms. Cudd's conduct was aggravated and not similar to Mr. Zlab's conduct.

b.  *United States v. Danielle Doyle*, 21-cr-324-TNM

- **Climbed in through a broken window.**

- **Present for 20-25 minutes**

- **Sentence: Two months of Probation.**

Ms. Doyle entered the U.S. Capitol by climbing through a broken window located next to the Senate Wing Door. Dkt. 27 at 2. Ms. Doyle entered the building at 2:20 p.m., which places her entry much closer in time to the original breach of the Capitol security than Mr.

Zlab's entry at 2:38 p.m. Ms. Doyle witnessed the mayhem and destruction outside, including individuals climbing statues and the scaffolding on the west front of the building, and she saw the torn fabric on the exterior of the scaffolding. Dkt. 27 at 3. Ms. Doyle entered the U.S. Capitol building at 2:23 p.m. and remained for at least 24 minutes. Dkt. 27 at 2-3. After being stopped by a law enforcement officer near the Statuary Hall Connected, evidence appeared to show Ms. Doyle chanting or yelling in the direction of the officer.

Ms. Doyle's conduct is aggravated as compared to Mr. Zlab.

### c.  *United States v. Sean Cordon* 21-cr-269-TNM

- **Climbed in through a broken window**

- **Wearing body armor and toting a gas mask**

- **Sentence: Two months of Probation**

Mr. Cordon entered the U.S. Capitol by climbing through a broken window on the Senate Wing of the Capitol. Dkt. 24 at 3. Mr. Cordon traveled to Washington, D.C. from Los Angeles with his brother. They each wore light body armor and carried a gas mask. Dkt. 31 at 2. Both brothers recalled watching a rioter push a police officer and get in a shoving match. *Id.* Mr. Cordon's conduct is aggravated as compared to Mr. Zlab's conduct.

### 3.  A Sentence of Incarceration is Not Justified Given the Non-Custodial Sentences Given to Numerous Other Defendants with Conduct Similar to or More Aggravated than Mr. Zlab's Conduct

Dozens of other defendants – some who are similarly situated, and some with clearly more aggravated conduct – have received non-custodial sentences. Here are a few examples:

      a.   *United States v. Jeffrey Witcher*, 21-cr-235-RC: 12 months of Probation; 60 Hours of Community Service

Mr. Witcher was approximately 300 yards away from the Capitol when it was initially breached. He was in the Capitol for between 15-20 minutes. Dkt. 39 at 3, 5. Mr. Witcher is recorded on video yelling at law enforcement stating "Our house! Our house! Our house! Don't be a traitor! Fulfill your duties, man. Do or die! Do or die! Do or die! Be with us! Be with us! Be with us!" Dkt. 20 at 4. This conduct is more aggravated that Mr. Zlab's conduct.

      b.   *United States v. Julia Sizer*, 21-cr-621-CRC: 12 months of Probation

Ms. Sizer entered the Capitol around 2:48 p.m. and recorded video of a tightly packed crowd of rioters moving through the Parliamentarian door while shouting "USA! USA!" Dkt. 18 at 3. Ms. Sizer initially falsely told the FBI that she did not enter the Capitol. Dkt. 26 at 6. Ms. Sizer stated that she did not realize how serious the events at the Capitol were until watching the news later, and she thought that law enforcement had allowed protesters to enter the Capitol building. After watching the news, Sizer said she felt sick to her stomach and wished she had not gone inside the building. Dkt. 26 at 6. Ms. Sizer's conduct is similar to Mr. Zlab's conduct, except that Ms. Sizer initially lied to the FBI.

      c.   *United States v. Eliel Rosa*, 21-cr-68-TNM: 12 months of Probation; 100 hours of Community Service.

On the morning of January 6, 2021, Mr. Rosa posted on social media: "And we fight!!!" Dkt. 66 at 4. Mr. Rosa entered the Capitol around 2:35 p.m. and spent 20 minutes inside the Capitol, walking through the Rotunda, Statuary Hall and Statuary Hall Connector. Later, Mr. Rosa posted an image on Facebook proudly documenting his time in the Rotunda. Dkt. 66 at 6. Mr. Rosa's conduct is similar to Mr. Zlab's but still more aggravated because he

stayed in the Capitol longer and expressed his intention to "fight" on the morning of January 6.

        d.   *United States v. Brandon Nelson*, 21-cr-344-JDB: 24 months of Probation.

Mr. Nelson noticed civilians on scaffolding and observed police shooting pepper balls outside the Capitol before he entered. Dkt. 41 at 3. As noted by the government, Mr. Nelson was inside the Capitol for well over an hour. Dkt. 49 at 13. Later, Mr. Nelson sent text messages to others including: "We held the line…No backing down." When a friend messaged him, "Fuck. Yeah, brother is Patriots won't go down without a fight," Nelson responded. "Not I." Dkt. 41 at 4. Mr. Nelson's conduct – in particular the length of time he spent in the Capitol – is aggravated as compared to Mr. Zlab's conduct.

        e.   *United States v. Andrew Hatley*, 21-cr-98-TFH: 36 Months of Probation.

Mr. Hatley entered the Capitol Building by climbing in through a smashed window. Dkt. 24 at 3. He initially entered the window and climbed out again. After two minutes, he re-entered the Capitol. Mr. Hatley was wearing a respirator mask. Dkt. 35 at 4. Mr. Hatley took multiple selfie photographs while in the Capitol. Dkt. 35 at 4-6. Mr. Hatley was in the Capitol for about 15 minutes. *Id.* Mr. Hatley's conduct is similar to Mr. Zlab's conduct, but still reflects some aggravated facts – entry and reentry through a broken window; respirator mask as evidence of preparation for a volatile situation; present in Capitol for slightly longer than Mr. Zlab.

Mr. Zlab should receive a lesser sentence that Mr. Hatley's 36 months of probation.

f.  *United States v. Anna Morgan-Lloyd*, 21-cr-164-RCL: 36 Months
of Probation; 120 Hours of Community Service

On January 6, 2021, Ms. Morgan-Lloyd wrote, "I'm here. Best day ever. We stormed the capital building me and Dona Bissey were in the first 50 people in." Later, she wrote, "It was a day I'll remember forever. I'm proud that I was a part of it! No Shame" and "That was the most exciting day of my life." Dkt. 22 at 3-4. Ms. Morgan-Lloyd's case is substantially aggravated – most notably her social media bragging and lack of remorse – as compared to Mr. Zlab's case.

The foregoing are merely examples. There are numerous other cases in which January 6 defendants have received non-custodial sentences for similar or more-aggravated conduct than Mr. Zlab's conduct.  *See, e.g., United States Thomas Gallagher*, 21-CR-00041-CJN (24 months of probation and 60 hours of community service for defendant who threw up his arms in the direction of officers who had formed a defensive line and admitted hearing an officer tell him, "[Y]ou cannot remain in the building" but claimed he did not know where to go after hearing the officer's admonition); *United States v. Abram Markofski*, 21-CR-00344-JDB (24 months of probation for defendant who was inside the Capitol for nearly 1.5 hours and texted to a friend, "Fuck. Yeah, brother is Patriots won't go down without a fight"); *United States v. Jacob Hiles*, 21-cr-00155-ABJ (24 months of probation and 60 hours of community service for defendant who brought goggles to the Capitol and posted multiple videos and photographs showing he and his cousin inside and outside the Capitol on Jan. 6, including smoking an unknown substance); *United States v. Douglas Wangler*, 21-cr-00365-DLF (24 months of probation and 60 hours of community service for defendant who

entered the Crypt, posed for multiple photos next to busts of Abraham Lincoln and George

Washington, and remained in the Capitol for about 20 minutes).[6]

---

[6]    It is worth noting that other political protest arrest cases have resulted in local D.C. charges -rather than prosecution in federal court – with far less serious consequences.

    For example, in the fall of 2018, protesters descended on Washington, D.C. to protest U.S. Supreme Court Justice nominee Brett Kavanaugh. Hundreds of people were arrested. *See* "Kavanaugh protests escalate, over 120 arrested on Capitol Hill," CNN (9/24/18)(noting that Capitol Hill Police said 128 people were arrested for "unlawfully demonstrating" out of senators' offices and in the main rotunda of the Russell Senate Building); "In photos: Protesters rally against Supreme Court nominee Brett Kavanaugh, CNN (10/6/2021), https://www.cnn.com/2018/10/05/us/gallery/anti-kavanaugh-protests/index.html (numerous photographs showing "[p]rotesters storm[ing] the steps of the U.S. Supreme Court building as Judge Brett Kavanaugh is sworn in); "More than 300 protesters arrested as Kavanaugh demonstrations pack Capitol Hill," CNN, October 8, 2018, https://www.cnn.com/2018/10/04/politics/kavanaugh-protests-us-capitol/index.html.

    These protesters were overwhelmingly charged under the local D.C. Code, rather than in United States District Court. *See* "U.S. Capitol Police Respond to Multiple Instances of Unlawful Demonstration Activities," United States Capitol Police (10/5/18), https://www.uscp.gov/media-center/press-releases/us-capitol-police-respond-multiple-instances-unlawful-demonstration (official U.S. Capitol Police Press Release noting on October 5, 2018, a total of 101 individuals were arrested, including in the Senate Office Buildings, Senate Gallery, and Dirksen Senate Office Building, and charged under D.C. Code §22-1307, Crowding, Obstructing, or Incommoding and DC §10-503.16(b)(4), Unlawful Conduct). According to media reports, some arrestees from the October 5, 2018 protest – including actresses Amy Schumer and Emily Ratajkowski – were issued a $50 fine related to their arrest under the D.C. Code. *See* "Here's the Penalty Amy Schumer and Emily Ratajkowski Will Face for Arrest at Anti-Kavanaugh Protest," The Wrap (10/4/18)("Arrestees will be charged a $50 fine for the misdemeanor offense, according to police").

    The U.S. Attorney's Office did charge Tighe Berry in United States District Court related to his protest at the Kavanaugh proceedings. *See United States v. Tighe Berry*, 18-mj-111-RMM. In a Motion to Dismiss filed by his attorney at the D.C. Federal Public Defender's Office, Mr. Berry noted that his case appeared to be the first such prosecution in federal court. Dkt. 10 at 4. Mr. Berry's filing confirmed that nearly all of the other persons arrested during the fall 2018 proceedings were "cited and released." *See* Dkt. 10 at 3 ("approximately 1188 arrests were made by the U.S. Capitol Police. Of those 1188 arrests, approximately 503 people were repeat offenders, meaning they were arrested on more than one occasion…of the 1188 people arrested during this time period, approximately 1179 people were cited and released, paid a fine or had yet to pay a fine").

    This information is not submitted to suggest political bias or unfair treatment. Instead, the foregoing information is submitted to emphasize that a probationary sentence in federal court jurisdiction – with restrictions and limitations on the Mr. Zlab's conduct – carries significant punitive, deterrent, and rehabilitative consequences.

### 4.  The Government's Cited Cases are Not Comparable

a.  *United States v. Jeffrey Register*, 21-cr-349-TJK

The government suggests as a comparable case *United States v. Jeffrey Register*, 21-cr-349-TJK, where the defendant was sentenced to 45 days in jail. *Zlab*, Dkt. 43 at 24. The government's description of Mr. Register's case – which is far more aggravated that Mr. Zlab's case – omits many of the material facts that the government itself presented in Mr. Register's sentencing proceedings:

Mr. Register was waiting outside to enter the Capitol less than five minutes after the initial breach. Dkt. 30 at 5. Although he initially ran away after hearing a report of a "gun," Mr. Register returned shortly thereafter when it was determined it was a rubber bullet that had been fired. Dkt. 30 at 5-6. He entered the building very early in the breach, around 2:16 p.m. Dkt. 30 at 6. Soon thereafter, Mr. Register found himself in direct conflict with law enforcement officers: "[t]he officers behind Register and to his right were instructing the crowd to leave and pushing the crowd outside, though they did not have complete control over the crowd…officers eventually formed a line to block even more rioters from breaching the building…Register watched this scene, refusing to leave, for roughly 90 seconds." Dkt. 30 at 7-8. Indeed, "[o]n at least three occasions, officers touched Register to direct him toward the door or prevent him from moving back into the building":



Dkt. 30 at 8. "Register eventually spun past these officers and went back into the building"

where "[h]e soon encountered another line of law enforcement officers":



Dkt. 30 at 9. "These officers repeatedly told the crowd that they could not go any further.

Nonetheless, the crowd pushed forward." *Id.* Despite all of this confrontation, Mr. Register

"then wandered the halls of the U.S. Capitol for nearly another half an hour." *Id.* at 10.

Around 2:40 p.m., Mr. Register was part of a crowd of individuals attempting to break into the main entrance to the House Chamber. *Id.* at 11. As noted by the government, the House chamber was barricaded from inside, producing this chilling and iconic photo:



*Id.* at 30.

Later, Mr. Register discovered "the weakly guarded hallway that led directly to the entrance to the Speaker's Lobby." Dkt. 29 at 13. Mr. Register and another rioter ran toward a large crowd "excitedly, waving their arms to signal them to follow them around the corner":



*Id.* at 30.

Within moments, the mob followed Mr. Register's direction:



*Id.* at 15.

As noted by the government: "[w]ithin less than two minutes, Ashli Babbit was shot and killed at the location to which Register had enthusiastically drawn the crowd." *Id.* at 16. In its sentencing memorandum in Mr. Register's case, the government acknowledges "Register's conduct at a pivotal moment in the riot…Register bears some personal responsibility, therefore, for bringing a large crowd to one of the last lines of defense between the rioters and members of the House of Representatives, and to the brink of a direct and potentially violent confrontation with those members. Indeed, Register's conduct arguably contributed to the circumstances leading to the fatal clash that occurred just minutes later when the rioters breached the weaker access point at the entrance to the Speaker's Lobby after they were stymied at the House Chamber's main entrance." *Id.* at 23.

Mr. Zlab's case is not at all like Mr. Register's case. To the contrary, Mr. Register played an active role in one of the most crucial and tragic moments of this event, raising the specter that, had Mr. Register not enthusiastically waved the crowd to follow him toward the weaker access point he discovered, Ms. Babbitt may still be alive today. Mr. Register's sentence of 45 days incarceration – seemingly lenient given his oversized role – is not a comparable case for Mr. Zlab's sentencing determination.

b.   *United States v. Joshua Wagner*, 21-cr-310-ABJ

Likewise, the government's comparison (*Zlab*, Dkt. 43 at 24-25) of Mr. Zlab to Joshua Wagner – who received a 30-day jail sentence – omits nearly all of the relevant facts cited by the government in its sentencing memorandum in Mr. Wagner's case.

Mr. Wagner took a leadership role on January 6. On the way to the Capitol, he began exhorting members of the crowd to "[h]old your positions. We will lose our ground if…we

keep retreating back." Dkt. 66 at 5. Later, after learning that "they shot a girl in the neck," Mr. Wagner responded, "Why does no one have ARs and shit, dude?...Dude, we could literally take it over right now dude." *Id.* at 5. Later, he told a friend: "Dude, we gotta hold, bro. I feel like people are gonna show up with weapons now." *Id.* at 6. Mr. Wagner entered the Capitol by climbing through a broken window. *Id.* at 7. After entering the Crypt, Mr. Wagner told other rioters, "We need to start barricading so they can't enter." *Id.* at 8. After leaving the Capitol, Mr. Wagner told others: "I'm gonna come back…Hold the perimeter. Trump's calling in the National Guard, I think" and "You wanna fight, you can go in there and fight." *Id.* at 10-11. Notably, a witness told the FBI that Mr. Wagner always carried a handgun, and that before leaving for Washington Mr. Wagner discussed going to a shooting range. *Id.* at 65-66. Although Mr. Wagner's friend who accompanied him to the Capitol claimed that Mr. Wagner took a pistol into the Capitol, the FBI could not substantiate these claims. *Id.* at 12 n.9. In total, Mr. Wagner was in the Capitol from 3:10 p.m. until 3:35 p.m. – a total of 25 minutes.

Mr. Wagner's conduct is aggravated and not similar to Mr. Zlab's conduct. Mr. Wagner exhorted the crowd and repeatedly engaged in incendiary and violent rhetoric. This conduct – combined with the possibility that he was carrying a pistol – is downright dangerous. He entered the Capitol through a broken window and stayed inside for twice as long as Mr. Zlab. Mr. Wagner's 30-day jail sentence is not a comparable case for Mr. Zlab's sentencing determination.

### C.  Mr. Zlab's Regrettable Prior Criminal Conviction Does Not Justify an Incarceration Sentence in this Present Case

Seven years ago, Mr. Zlab was arrested and pleaded guilty to the gross misdemeanor offense of Harassment – Domestic Violence for making threats to his wife while he was intoxicated.[7] It is clear that Mr. Zlab was dealing with an alcohol abuse issue that required intervention. Following his arrest Mr. Zlab sought appropriate treatment and changed his life. He dutifully complied with all probation conditions. Since then, there have been no further similar incidents, and his relationship with his wife has thrived.

Mr. Zlab's prior criminal case and history of rehabilitation demonstrate that he responds well to corrective intervention. As his sister, Ms. Childers, writes: "Joe makes mistakes.  He does not repeat them.  He moves forward to a solution, seeks the best professional and spiritual help, and emerges stronger and more mature on the other side."

Respectfully, the present case bears no meaningful relationship to the circumstances of Mr. Zlab's 2015 conviction. If Mr. Zlab had entered the Capitol intoxicated, or threatened or committed violent acts against others – then it would be easy to argue that Mr. Zlab has not been rehabilitated, or that he simply has not "learned his lesson."

But he did none of those things on January 6, 2021.

These are two separate, unrelated acts that do not demonstrate a pattern or latent criminality. Mr. Zlab's prior regrettable criminal conviction should not sway this Court

---

[7] In Washington, a person commits harassment when he, without lawful authority, knowingly threatens to cause bodily injury to another person and the person threatened is placed in reasonable fear that the threat would be carried out. RCW 9A.46.020(1), (2)(a).

toward a custodial sentence that is otherwise not justified given the facts of this case as compared to the other probationary sentences imposed on similarly situated defendants.

### D.  The Facts Highlighted by the Government are Not Aggravating

The government's sentencing memorandum purports to highlight several "aggravating factors" associated with Mr. Zlab's conduct in support of its request for a 45-day jail sentence. Dkt. 43 at 17. None of these are aggravating factors as compared to other January 6 defendants:

Text Messages: The government notes that Mr. Zlab sent "several messages related to his entry into the U.S. Capitol building." Dkt. 43 at 14. But these were text and email messages sent to a small group of friends and his brother. Mr. Zlab never published anything broadly on social media, which differentiates him from many January 6 defendants. And given the universe of inflammatory rhetoric in other cases ("This is war"; "a revolution"; "Do or die!"), Mr. Zlab's messages are decidedly bland. *See* Dkt. 43 at 14 ("We got in the capital." "Little tear gas." "This is our house." "We got in." "They were pointing guns in OUR house." "I left inside a while ago when guns came out and gas.") These messages demonstrate Mr. Zlab's guilt for the offense to which he pleaded guilty to. But the content is benign when compared to the public proclamations by many January 6 defendants.

Remorse: The government argues that Mr. Zlab "has never expressed remorse for this incident." The government fails to mention Mr. Zlab's email to his brother and friend *at 5:11 p.m. on January 6, 2021*, less than two hours after leaving the Capitol, stating that the violence he was seeing on television was making him "sick," and noting: "[n]ot good at all…If things don't change I'm probably going to step away from it all. I'm not going to be a part of it if

there is chaos and no integrity." In the dozens of January 6 sentencing materials that undersigned counsel has recently reviewed, counsel has not seen an earlier repudiation of the violence and destruction than Mr. Zlab's email at 5:11 p.m. Many other defendants glorified their activities for days. *See infra* ("[i]t was awesome"; "finally famous"; "I fucking charged the Capitol today with patriots today. Hell, yes I am proud of my actions"; "That was the most exciting day of my life"). Mr. Zlab demonstrated exceptionally early remorse, and the email to his friends is unique among January 6 defendants and a substantially *mitigating* factor.

Duration of Time in the Capitol: The government highlights as a justification for its jail sentence the fact that Mr. Zlab remained in the Capitol building for approximately 13 minutes. But many defendants remained in the Capitol Building for 20-30 minutes or longer. As discussed above, this Court sentenced Anthony Mariotta to 36 months of probation, even though he was in the Capitol for 20 minutes. Brandon Nelson was sentenced to 24 months of probation despite remaining in the Capitol for well over an hour. Mr. Zlab and counsel both readily acknowledge that Mr. Zlab's time in the Capitol was thirteen minutes too long – he should never have been inside at all. However, to the extent that the duration of time spent in the Capitol is a meaningful way to distinguish defendants who engaged in aggravated conduct, 13 minutes *does not* fall into the aggravated category.

Mr. Zlab was Told to Leave: The government points to a recording in which a law enforcement officer is heard shouting toward Mr. Zlab and others to "get the fuck out of here!" Mr. Zlab should have left the Capitol immediately at that point. Indeed, he should never have entered the Capitol. Mr. Zlab knew – as did every defendant who has pleaded guilty so far in this prosecution – that it was unlawful to enter and remain in the Capitol. The presence of

police; the damage to the building; the knowledge that official proceedings were underway inside – all of these facts indicated to everyone who entered the Capitol that they should not be there, and that they should leave. This recorded admonition by the law enforcement officer is yet another indicator that Mr. Zlab was trespassing. However, it is not an aggravating factor because it does not meaningfully change his culpability relative to other defendants. Mr. Zlab did not fight, argue, or otherwise engage with the officer. In fact, Mr. Zlab immediately left the area where the officers were shouting back and forth with the protesters who are audible in the video. This fact does not justify the requested incarceration sentence.

Pictures of Mr. Zlab in the Capitol: The government has included numerous screenshots of Mr. Zlab walking through various areas in the Capitol. Again, these pictures confirm what Mr. Zlab has admitted: that he was unlawfully in the United States Capitol, that he knew he did not have permission to enter, and that while inside he walked through "the Crypt, the Rotunda, the National Statutory Hall, the hallway outside the Hall of the House of Representatives, the House Gallery, and the House Appropriations Room." Dkt. 35 at 4.

What these pictures do not show are Mr. Zlab: confronting any law enforcement; breaking any property; assaulting law enforcement; documenting any assaults on law enforcement (i.e., Anthony Mariotta); allowing other protesters into the Capitol (i.e., Jeffrey Smith removing benches to allow an angry mob into the resecured Rotunda); pushing or shoving; joining any particular group of rioters; participating in or otherwise taking glee in the dismantling of the Capitol infrastructure (i.e., Adam Johnson stealing the Speaker's podium for a photo op); or personally yelling at or engaging with any law enforcement officers. Again, Mr. Zlab and counsel reiterate that there should never have been _any_ pictures

of Mr. Zlab in the Capitol because he should never have entered. But to the extent that pictures

of the January 6 defendants provide a meaningful window into the respective culpability of

each defendant, the pictures of Mr. Zlab clearly demonstrate his guilt and participation in this

disgraceful event, but they do not demonstrate aggravated conduct when viewing the universe

of documentation of other defendants.

## V.   THE PRESENT STATUTORY SENTENCING SCHEME DOES NOT ALLOW FOR THE IMPOSITION OF A SPLIT SENTENCE FOR A DEFENDANT CONVICTED OF A PETTY OFFENSE

Mr. Zlab pleaded guilty to 40 U.S.C. 5104(e)(2)(G), a class B misdemeanor "petty

offense" punishable by a maximum of 6 months imprisonment and a $5,000 fine. 18 U.S.C.

§ 3551(b) authorizes the Court to impose a term of imprisonment *or* probation. Similarly, 18

U.S.C. § 3561(a)(3) prohibits the imposition of a probationary sentence where the defendant

is also sentenced to imprisonment. The defense further incorporates by reference the authority

and arguments made in the Brief of Amicus Curiae Federal Public Defendant in *United States*

*v. Jeremiah Caplinger*, 21-cr-342-PLF, attached as Appendix E.[8]

Accordingly, a straight probation sentence, with community service hours, conforms

with the relevant sentencing statutes and allows this Court to impose appropriate probation

conditions.

---

[8] Different judges have continued to reach different conclusions on this unresolved legal question. For example, Judge Lamberth reasoned that a split sentence is permissible in *United States v. James Little*, 21-cr-315-RCL, Dkt. 43. Judge Kollar-Kotelly ruled that a split sentence was not authorized in *United States v. Virginia Spencer*, 21-cr-147-CKK, Dkt. 70. Undersigned counsel believes from a review of the docket in *United States v. Jeffrey Smith*, 21-cr-290-RBW, that this Court recently ruled that a split sentence was lawful.

## VI.    CONCLUSION

Less than two hours after leaving the Capitol, Mr. Zlab immediately repudiated his involvement in the events at the Capitol on January 6, 2021, writing at 5:11 p.m.: "I'm not going to be a part of it if there is chaos and no integrity." Counsel is unaware of any other Capitol defendant who has expressed such a timely expression of remorse and regret. Those who know Mr. Zlab corroborate his repentance over his involvement, as observed by Ms. Childers: "[t]hat he was in error is to him, in hindsight, excruciatingly clear. Joe is truly sorry for what he did that day, and I don't simply mean the inevitable chagrin over consequences… I know this because it has come up more than once while we were talking. He is truly shaken, as we all are, by what happened that day."

Mr. Zlab broke the law when he entered and remained in the Capitol. His conduct is not defensible. Given the relative conduct of other defendants and sentences imposed to date, however, a probationary sentence is not only defensible but warranted.

Mr. Zlab did not post on social media. He did not gloat or boast after leaving the Capitol. He did not break anything or hurt anyone. He did not team with any other rioters or groups inside the Capitol. He did not allow other rioters into the building or facilitate further breaches. He did not use violent rhetoric. He did not bring a bulletproof vest or gas mask. He did not delete evidence or lie to the police. He did not give media interviews or post about his intent to engage in similar conduct.

Respectfully, the universe of sentences that have been imposed so far demonstrates that Mr. Zlab's conduct – while unlawful, disgraceful, and antithetical to the foundations of our democracy – falls at the non-custodial end of the sentencing spectrum.

For the foregoing reasons, the defense respectfully requests that the Court impose a

sentence of 12 months of probation, 40 hours of community service, and $500 in restitution.

RESPECTFULLY SUBMITTED this 29th day of March, 2022.

*/s/ Cooper Offenbecher*
Cooper Offenbecher, WSBA #40690
Attorney for Joseph E. Zlab
Allen, Hansen, Maybrown & Offenbecher, P.S.
600 University Street, Suite 3020
Seattle, WA 98101
206-447-9681 – Phone
206-447-0839 – Fax
cooper@ahmlawyers.com

*/s/ David Benowitz*
David Benowitz, DC Bar # 451557
Attorney for Joseph E. Zlab
Price Benowitz LLP
409 7th Street, NW, Suite 200
Washington, DC 20004
202-271-5249 – Phone
202-664-1331 – Fax
david@pricebenowitz.com

**CERTIFICATE OF SERVICE**

I hereby certify that on March 29, 2022, I electronically filed the above document

with the Clerk of the Court using the CM/ECF system, which will send notification of such

filing to all attorneys of record.

DATED at Seattle, Washington this 29th day of March, 2022.

/s/ Sarah Conger
Sarah Conger, Legal Assistant
Allen, Hansen, Maybrown & Offenbecher, P.S.
600 University Street, Suite 3020
Seattle, WA 98101
206-447-9681 – Phone
206-447-0839 – Fax
sarah@ahmlawyers.com